Good morning, Your Honor. I'm Michael Schein. I represent M-Cubed and our principal Tim Morgan is here in the court today and also the Sessions Historic Aircraft Foundation. The central issue in this case is whether Maersk committed a quasi-deviation sufficient to void the limitation of liability under COGSA when it imported M-Cubed's MiG-29 fuselage into Hong Kong without obtaining an import license, ordered that the fuselage not be trans-shipped, that is changed to another ship to be carried to Tacoma as originally set forth in the contract of carriage, and then turned the fuselage over to the Hong Kong authorities. The definition of a deviation under Nemeth, Ninth Circuit case cited in the brief, is a deviation is a serious departure from the contract of carriage exposing the cargo to unanticipated and additional risks. In order to void COGSA's limitation of liability, the deviation must be intentional and that requirement is made very clear by this court's decision in Vision Air that points out that this state of mind is a kind of narrowing of the doctrine of deviation which nonetheless does still very clearly under Ninth Circuit precedent survive the enactment of COGSA. So I want to focus on the issue of intent since Maersk will tell you, gee, we may be the largest shipping company in the world with an office in Hong Kong entirely dedicated to the problem of getting these kinds of import and export licenses, but golly we were surprised that the Hong Kong authorities told us that this MiG-29 jet fighter trainer needed a license, and gosh even more surprised when Hong Kong actually enforced the clear laws that were on their books by seizing the fuselage. And I'll pause for a moment to note that among the items designated as strategic commodities under CAP-60, the governing Hong Kong law, are quote, aircraft specifically designed or modified for military use including military training, and that's at the excerpts of record at 473. This is a very aggressive aircraft, front-line Soviet fighter, and it achieves Mach 2.3 for those of you who are aircraft enthusiasts and can climb nearly 60,000 feet in one minute. So there's really, even though this was a demilitarized training version, it fell clearly under the express language of the Hong Kong ordinance. Now Maersk states the test that it wants us to consider for intent in its brief at page 25. It says, to defeat summary judgment, MQ had to present evidence which would allow a reasonable fact finder to find that Maersk acted with substantial certainty that the fuselage would be seized by the Hong Kong authorities when it was trans-shipped there. And that is the visionary test, and we submit very clearly MQ has met this test on this record, and so it was error to grant summary judgment. The record shows, first, the testimony of Michelle Mok, who was Maersk's director of South China Sea's operations, which covers Hong Kong. She said, because both Henry, meaning Henry Ma, who worked in her office, and I had worked with Maersk Hong Kong, we knew that this sort of thing was something called a strategic commodity. A license was required. We knew that it violated the regulations of Hong Kong Customs and Excise Department. So the key, one of the key Maersk employees, or two of them, subjectively knew they needed a license to import this fuselage, and that they were breaking the law by bringing it in without a license. And there was a trial in Hong Kong court, is that correct? There were several trials. There was a criminal proceeding, and that testimony came from the criminal proceeding in Hong Kong, correct. Now possibly a juror could find what Maersk now claims it actually believed, that they knew they were violating the law, but thought that the worst they would suffer would be a fine. But that's a credibility determination. A juror could just as reasonably find that Maersk knew it could not limit the potential sanctions to be imposed, including seizure and forfeiture under Cap 60. We also submitted in the record at Excerpt 459 Angela Chan's testimony, where she was deposed. She was head of the Hong Kong division that was in charge of licensing, and she testified that she knew that forfeiture was mandatory under the Hong Kong regulations. Third, we have contemporaneous emails in the record, evidencing first that Maersk Hong Kong wrote to Maersk Czech saying that this subject commodity is under license control as a strategic commodity, Excerpt 367. Now it might be, no doubt, no surprise, the contemporaneous document said this is under license control. And most notably, we have in the record an email at Excerpt 518, written by Henry Ma in the Yantian office, on 2 April, which was sent one hour before Maersk unloaded the fuselage in Hong Kong. And it said, quote, the fuselage, quote, will be detained by Hong Kong customs because of the lack of any license application prior to container discharging. And, quote, there's no promised date when this container can be loaded. Again, very definite, will be detained, not might be detained. Henry Ma was substantially certain the fuselage would be detained by the Hong Kong authorities. I must be missing something. Why did they offload the fuselage in Hong Kong rather than choose a different route? Well, that's, I mean, that's a great question. There were, I think that what happened, Your Honor, was their initial negligence back at Maersk Check in failing to get the permits, failing to notify Hong Kong this was coming, and thereby failing to get the permits, led them to a situation in which they had a Hobson's choice. They had no really great options. They could either delay the ship and thereby slow down a bunch of other shipments. They could keep it on the ship and take it to Los Angeles, and they felt that they were then going to violate what's called the 24-hour rule with U.S. Customs. That's a rule that requires that at least 24 hours before loading, cargo must appear on the manifest of the ship that gets, the manifest then gets sent to U.S. Customs, so U.S. Customs has time to inspect. And there's a lot of... Why they were crossing the Pacific? Well, we have conflicting evidence on that point that was developed below. Our experts saying, yeah, it was already on the manifest for one ship going to Tacoma. It's a routine matter to ship it or change it electronically to a different manifest. Our opponents have contrary evidence saying, oh no, you couldn't do that. That would be a big violation. Our main point here on this appeal, and I've very clearly set this out, is we, it's not our responsibility to fix the problem that Marist created. They're the carrier. We're the shipper. We expect to receive our item not 22 minutes, 22 months late, where the contract says they're going to ship it. Fourth, we have evidence. I mean, usually on summary judgment, you have to come to the court after you've lost and say, you know, hypothetically, a reasonable fact finder could find thus and such, in this case that Marist knew it was violating the law and that it expected serious consequences such as possible long delay or seizure or forfeiture. In this case, a reasonable fact finder, the Hong Kong magistrate, has already found that when Marist intentionally decided to offload the unlicensed fuselage, it knew it was committing a criminal offense, which subjected the cargo to the serious risk of forfeiture and that it cooperated with Hong Kong authorities solely to mitigate its offense. Now, we don't claim that this is binding in the form of collateral estoppel, which was raised by Marist. All we're saying is this is evidence to be considered that a reasonable fact finder could have found in our favor and, therefore, summary judgment was an error. Hong Kong magistrate is equivalent to a Seattle juror? Not a juror, a judge. A judge. There's no right to jury trial here for damages? I am, I will not pretend to be an expert on Hong Kong law. I just know that both these matters, the criminal and the forfeiture, were tried to this magistrate. A reasonable trier of fact, we're talking about a Seattle trier of fact, a judge or a jury. And you're saying that because a Hong Kong magistrate found there to be intentional criminal action, then that means that somebody in Seattle would agree with a Hong Kong magistrate. And I'm trying to figure out why that would be so. Oh, well, I'm just suggesting, you know, I mean, that this is a person who is appointed as a judge in Hong Kong, so is a reasonable person. We can fairly be inclined. And if you look at the decision... The basic assumption is that all Hong Kong magistrates are reasonable persons. I guess that's right, Your Honor. Well, what was that magistrate's name? John Glass. John Glass. Yes. And they follow the common law of England? Well, I know that this is governed very, very much by the regulations, but they do. Actually, it is a common law country, yes, but not necessarily of England. But you did follow a common law Hong Kong decision on the question of causation. So they use common law. Well, it was a British possession for, what, a couple of hundred years? Yes. And as I recall, the magistrates and other officials remained in their positions and they just carried on. I think that's correct, Your Honor. Do they still have appeal to the Privy Council in London? I couldn't answer that. You're asking some really tough questions here. I don't know that much about the Hong Kong system. I'm sorry. So I'll just conclude and reserve the remainder of my time saying that MQ necessarily assumed the ordinary risk of carriage storms at sea or mechanical difficulties, that kind of thing. But it did not accept the risk that Maersk would import its fuselage illegally into Hong Kong and then attempt to mitigate the offense by turning it over to the Hong Kong authorities. Thank you very much.  My name is Bob Bacow with Kiesel, Young & Logan, and I represent Maersk, which is the ocean carrier in this case. For your sake, I think no trip to Seattle would be complete for the circuit if it didn't have at least one maritime case. And I think this is it for you. This is a case where the shipper is trying to avoid the $500 limitation liability. There are two ways to do that. One would be to argue that there was no notice and opportunity for the shipper to learn that they could declare a higher value and make the carrier its insurer. That's not an issue in this case. MQ knew about that, chose not to declare a higher value, and went out and bought insurance, which is what most shippers do. Instead here, MQ is trying to defeat the $500 package limit, which CAGSA specifically provides for, by making a novel argument that there was a quasi-deviation, which was unreasonable here. Well, the import laws were violated. It's a complicated question, Your Honor. There were two proceedings in Hong Kong. The first proceeding was a criminal prosecution. And the prosecutors in Hong Kong attempted to prosecute Maersk, Hong Kong. It's a Maersk agency, which is located in Hong Kong. And in fact, the court determined that there was no criminal violation there and acquitted Maersk, Hong Kong. And you'll find that in the record at ER663 through 664, specifically on the finding that the Maersk agents did not contemplate or desire the problem that came about with the lack of licenses, because they didn't know about it until it was too late to do anything about it. And that's a very important point. They're in the business, and they're a huge shipping company. Maersk knows about the fact that in some ports... They knew what they were shipping. They certainly knew what they were shipping, Your Honor. And when you tranship, which is what we have here, you literally have to take the cargo off ship A. Put it on the terminal, which means it's technically inside the country. And then you lift it from there on to ship B. That was intended from day one, that there was going to be a transhipment from one vessel to another at Hong Kong. It's one of those nodes that exists in the world where containers are transferred from one vessel to another every day. Thousands and thousands of them. And that's done there. The mistake that occurred, and what MQ refers to as the negligence, was the arrangement for the shipment without checking to see whether or not a license might be required in advance. All the evidence that they're pointing to are Maersk agents in Yantian, China, the last port called before Hong Kong for the ship which has this fuselage, and the agents at Maersk, Hong Kong. The same magistrate in Hong Kong, again, ruled that they learned about this too late to do anything about it. The key point here for you is that this court set the standard. They, meaning the agents who are in Yantian, China, and Hong Kong. They're close to each other because the sailing from Yantian to Hong Kong is less than a day. So they're very close to each other. And what they do is Yantian, knowing that there are going to be transshipments in Hong Kong, tries to gather information that will help the stevedores know about especially what's known as out of gauge cargo. Not all cargo fits nicely into a 40 foot container. The contract of shipment, which contemplated a transshipment at Hong Kong, was entered into where? It was entered into, I think, in cyberspace. When you consider the fact that the shipper was here in the United States, it went to an agent in order to make the arrangements. He hired a sub-agent. But I'm saying what I'm asking you, counsel, is that the contract of transshipment was not made with the Maersk agents in the last Chinese port. Absolutely right. It was the Maersk agents at Hong Kong. So one can understand why the criminal court would say that these individuals did not have the knowledge and intent necessary to be individually liable for prison time. But Maersk, when it made the contract, knew or was chargeable with knowledge of the Hong Kong regulations. That's certainly the argument for the gentleman who was in the Czech Republic, as a matter of fact, because it was a shipment from Ukraine. So the nearest Maersk agent was in the Czech Republic. And that would be evidence of negligence by Maersk, that it should have known that something more was needed in terms of paperwork for this transshipment in Hong Kong. The ultimate cause and effect of the lack of the license from Hong Kong was that the fuselage was detained for 22 months. It was the lack of the license, absolutely, that caused the delay and the seizure. That doesn't mean under visionaire, where this court set the bar very high to prove a quasi-deviation, that there was an intentional cause of consequences. And the definition that this court gave there is substantially certain. You can prove intent by saying that the actor was substantially certain, not that a license was needed, but of the consequences. Those are the words that this court used, that you have to be substantially certain of the consequences of the act. A person who throws a lighted match on gasoline has to be substantially certain that there will be a flame. I think that that would be the case. And under the standard that was applied in visionaire, it's got to be evidence of the actor himself. You can't have objective evidence that it was obvious to everybody else in the room that the bad thing was going to happen. That doesn't qualify under visionaire. This court said in that case where you had two trucks that were being offloaded in Asia and the stevedores did not bother to use a platform under the trucks or a spacing bar. They just put slings around these trucks one at a time. The first one was offloaded and it was destroyed. And you're saying it was not substantially certain to Maersk at the time of the cyberspace contract that the failure for a license to be obtained would cause a. Absolutely not, Your Honor, because the actor in that case was Pavel Tishy, who's in the Czech Republic. And he didn't even recognize that there would be a need because it's a demilitarized aircraft. And so he didn't recognize that there would be a need. And the overall company is not charged with knowledge of what happens in Hong Kong as far as transshipment of military material? Absolutely, it's charged with knowledge once they learn about it and they have any opportunity to do anything about it. They learn about it the minute the contract is made. It's a fuselage going from Ukraine that's going to be transshipped in Hong Kong. That, as you say, in cyberspace is communicated instantaneously to Maersk. Sure, but at that time, there's no substantial certainty by anybody that there's going to be a seizure for forfeiture. Well, but wait a minute. The citation that was given by your learned friend was that there were three indications prior to it arriving there at ER-518, Henry Ma, at ER-104, Michelle Mach, and Angela Chan. All of whom are in Yantian in Hong Kong. And they're realizing that we may have a problem. Their knowledge is Maersk's knowledge. Their knowledge is at that time. A reasonable trier of fact have said, well, if Chan, Mach, and Ma knew it and they were working for Maersk, the people at the head of Maersk knew it. But that does not mean that they intended this in terms of having substantial knowledge of the consequences because they learned about it too late to do anything about it. Counsel's conceded they didn't learn about it too late. At the time the contract was made, Maersk had a body of knowledge. The body of knowledge is reflected by what Ma, Mach, and Chan said. They didn't say, we just learned today that they would hold it. We knew that they would hold it. That knowledge is imputed to the company. Your Honor, I think the difference is they didn't even know that this fuselage existed. And it's got to be. And they don't need to know this specific fuselage existed. I mean, I think Judge Baya's point is that Maersk is a shipping company, has institutional knowledge that a license is required for the strategic goods, whatever it's called. That would set up, Your Honor, an argument for negligence. But it doesn't set up an argument for substantial certainty. You could say the same thing as to the stevedores in the Visionaire case. I'm sure that there were people within that stevedore company which knew, if we put swings on these two trucks and try to lift them off, they're going to be damaged. It's like arriving in a country without a passport and saying, well, I didn't know that I needed a particular license to come in this country. It's not a question, Your Honor, though, of whether or not they knew a license was needed. Because under Visionaire, they had to know and be able to do something about the consequences of that. It was not a foregone conclusion, first of all, that it was a strategic commodity. Ultimately, it took the Hong Kong government a week to do its own investigation as to that. Ma, Mac, and Chan thought it was a strategic commodity. They were concerned about that. Absolutely right, Your Honor. They were not concerned. They testified under oath that that was so. And ultimately, Your Honor, in the forfeiture proceedings, which is the second Hong Kong proceeding, the same magistrate handled that as well. He determined that it was not subject to forfeiture. Because at the time the forfeiture proceedings were started, there had been a piece of paper from the United States. Apparently, this is what was missing, which said, hey, this thing is now registered, able to come into the United States as a civil aircraft. It's this question of whether or not it was demilitarized or demilitarized enough. So there was substantial certainty of a risk, but not substantial certainty of the forfeiture. That's absolutely right, Your Honor, because under Visionaire, negligence doesn't get you there. Gross negligence doesn't get you there. Not even recklessness. It's got to be substantial certainty of the acts. And the acts they're talking about is whether or not these people in Yantian and Hong Kong could have done something at that time. If I'd like to give you an analogy, if I could, if you change the facts a little, you've got a mate on the bridge of the ship. And he negligently creates a conflict situation where he's going to have a collision with another ship. So that's equivalent to the gentleman in the Czech Republic. The master comes onto the bridge and realizes, because they've got this institutional knowledge, this is a problem. I think we're about to have a collision with this other ship. And the master does everything that he can to try to figure out how to avoid the collision, but the collision occurs nonetheless. You can say he had substantial certainty that they were going to strike the other ship, but that doesn't turn the negligent act into one. The defect in your hypothetical is the contract is made here by the master, not by the mate. And the master's knowledge is what's important. I think that, with all due respect, Your Honor, the analogy would be the same regardless of whether the master or the mate was in charge at the beginning. The point is, you have negligence, which sets things into motion, and eventually somebody in the company determines, I think we may have a problem here, but they can't do anything about it at that time to avoid the harm. That doesn't turn the negligent act, if that's what it is, into substantial certainty, not into intent as defined by visionaire. It's got to be intent as to the consequences themselves. I want to make it very clear here that I don't believe that, at this point, M3 is arguing for a geographic deviation. That's the more traditional argument for an unreasonable deviation. But even visionaire says that's the original. That's the original one. But here, it was always planned that there was going to be a transshipment at Hong Kong. And it was always the plan that they would take this container off the Caroline Maersk, which is the ship that brought it to Hong Kong, put it on the dock, and within a day or so, put it on a different ship called the Horizon Pacific. And the complaint here is that somehow Maersk deviated by not going ahead and doing that. But that overlooks the point that the Hong Kong government had told Maersk, if you do that, you're going to be prosecuted. And they detained it for their investigation to determine whether or not it was a strategic commodity. And under those circumstances, you can hardly fault Maersk for not going ahead and sending it on its way on another ship, because they would have been defying the authorities who were there in Hong Kong. So there was no opportunity to do that. The words used in the Visionaire case, given the facts of that case, was that there would have to be an intentional destruction of the cargo. Maersk had no interest in this case of purposely subjecting this MiG fuselage to a seizure for forfeiture purposes. It tried to avoid that. It had the professionals in Yantian in Hong Kong who did everything they could to act proactively and professionally to try to avoid the harm. But as the magistrate in Hong Kong found, it was too late in the day when they learned about it for them to be able to avoid the problem. I want to emphasize that with respect to this question of strategic commodity, it was far from clear that it was necessarily going to be found to be a strategic commodity by the Hong Kong authorities. It did take them a week to investigate after this fuselage arrived. It was demilitarized. That was the start of any problem, because Mr. Tichy in the Czech Republic, who worked for Maersk, thought that no license would be required for the reason that it was demilitarized. So there was some confusion. And ultimately, after a lot of court proceedings in Hong Kong, the Hong Kong magistrate ultimately released it. And that was based on the fact that there was a piece of paper that said, this is registered for civil use in the United States. So I think that it's fair to say that Maersk realized there was a risk of a problem, but didn't actually know that it was a strategic commodity or that the Hong Kong government would consider it to be so. All along, was Maersk keeping Amcube aware of what was going on? Well, you've got to remember, Your Honor, this only arose, the problem was first learned on April 1, in the middle of a shipment. By that time, this thing is about five or six weeks into its shipment from the Ukraine to Italy and then Yantian in Hong Kong. It takes a long time for it to make its way there. So they could check online anytime to see where their container was. When they learned it was going to be detained, Maersk did contact the shipping agent that Amcube had hired to tell them that this was being detained in Hong Kong. Even then, they didn't expect what ended up being 22 months worth of seizure while these legal proceedings went on. Your point is there's no real deviation here because Amcube knew fully well it was going to be a trans-shipment. Absolutely, from the beginning. Absolutely. There was nothing done differently. They're actually arguing that there should have been a deviation from the planned carriage in order to avoid an unreasonable deviation, which doesn't make any sense. They did exactly what was planned right up to the point in time until the Hong Kong government said, don't send that on its way to the ship as planned or we're going to prosecute you. And then they detained it for their investigation. And then a week later, they decided we are saying it's a strategic commodity and we're issuing this retroactive seizure notice. I think we're clear about it. Thank you. Let me ask you this question. We've been talking about Amcube's reply materials that include this testimony from Merzick employees that they knew they needed a license and that the MiG was strategic goods. And did the district court consider this evidence? It did not, Your Honor. It was stricken on the morning of our oral argument on summary judgment. And the reason was there was a local rule and there was a scheduling order. And Amcube's lawyers violated both of those because the court said you've got cross motions for summary judgment. You're each allowed two briefs. So you each get to file your motions and you each get to file opposition, nothing else. What Amcube was doing was filing reply papers, not opposition papers, with materials that they already had. Yeah, but their affidavits in opposition to summary judgment, aren't they? Under Rule 56C, they're permitted. They were. The deadline for filing opposition papers was 19 days before they filed it and not on the eve. That's reply papers. But Rule 56C, does it not say that you can file opposition papers? Opposition affidavits up until the day before the hearing. Right. And this court, in the Marshall case, also said that the local courts have discretion to set scheduling for the deadline by which that can be done. It doesn't mean, Marshall expressly said, it doesn't mean you get right up to the moment of hearing. The district court can set a deadline. That's correct. All right. What does the local rule say? The local rule, Your Honor, on a typical case, if you don't have cross motions. The local rule in this court? The local rule in this court, Local Rule 7, says, summary judgment, the moving party files its moving papers. It notes it for a Friday. The party opposing the summary judgment files its papers on the Monday before that designated Friday. And then reply papers are filed on the Friday, the day on which it's noted. In this case, the motion was noted by the court for October 12. It wasn't argued on October 12. That's just a consideration date, which sets up the briefing schedule, which I just said to you. The court also said, however, because you have cross motions, I don't want six briefs. The court said, I want no more than four. So each of you get to file your motions, and each of you get to file your opposition papers. And the court said, your opposition papers are due no later than October 12. That would have been the deadline also, because it was the noting date for any reply brief under our local rules. For whatever reason. But the local rule here, talking about reply briefs, says, the moving party may, within the time prescribed by CR 7D, file with the clerk and serve on each party that has appeared in the action, a reply brief in support of the motion. Together with any supporting material of the type described in Section 1. Now. That's right, Your Honor. So you have a situation here where we have these cross motions for summary judgment. And so those motions and the papers in support of those motions are filed. And then each party then files a response. That's what was done here. That's supposed to be the end of it. That's right, Your Honor. What if new material shows up? Two things, Your Honor. If you get new materials, there were none here. But if you did get new materials, it would be your obligation to come to the court and ask for leave to file something beyond what was done here. But the rule says that you may file it. This court, sorry, not this court, but the district court issued a specific briefing order for these motions and said basically no reply briefs. But even if you did it under the rule, the rule sets the deadline for the filing of reply papers. And the deadline is the noting date. It's that Friday that I mentioned. M-cubed held its papers for 19 days more and decided to drop them on everybody, including Judge Peckman, who never saw them, the night before oral argument, 19 days late. So what I'm saying is if you applied that rule that you're looking at, it gives a deadline for filing reply papers. That deadline was October 12. The papers were filed on Halloween, October 31, the evening before oral argument the next morning. So when we moved to strike, Judge Peckman was surprised because she said I didn't even know papers had been filed. It hadn't even come to her attention yet because it had been held for so long. And at oral argument. Those things happen all the time with lawyers. I don't know whether these were local counsel or people are familiar with some of these local rules or not. But, you know, I just wondered if critical information comes in on a reply brief and the rule says may within the time prescribed be filed. And there's important information there, whether just disregarding that or not considering it when it may be critical or important, whether that might be an abuse of discretion. Well, that's the standard, Your Honor. It'd be wonderful if lawyers would follow the rules. It'd be wonderful if lawyers would follow good, clear, short briefs. But it doesn't seem to work that way. Well, the stuff we get comes in late. And it's a fairness issue, I think, Your Honor. It's the right standard. It's abuse of discretion in the court's own interpretation of its own scheduling order and its rules. So it came in. I mean, is there any evidence to show that they, that MQ did this intentionally? The fact that they waited until the night before oral argument and the fact that the court order and the local rules gave them a deadline of October 12 suggests that, certainly. But, Your Honor, if I can. There's no finding on that. There's no finding on that, Your Honor, other than the judge's order that they are stricken. There's no problem. Well, to put the matter off for a few days, let you look at it or pick it up from there. Here's the point, Your Honor. Under Rule 56, under Rule 56 in this court's jurisprudence, Rule 56 guarantees everybody a fair opportunity to oppose a motion for summary judgment. They had all these materials. They could have filed them with their own cross motion or they could have filed them with their opposition to our papers. I don't know whether they had those materials or not. We've explained that to you in the brief, Your Honor, that all of those materials were available to them. The one and only different thing that was new was the fact that eventually the court in Hong Kong issued its ruling that the MIG was not subject to forfeiture under the strategic commodity law and it was releasing the MIG. That's the only thing that came after the briefing. Everything else, including depositions of these same witnesses, they were all deposed by MQ's lawyers. They had all these materials. So it's a fairness issue. Did they have a fair opportunity to present these materials? They were all in their possession. They could have done it with their cross motion. They could have done it with their opposition. Was there a hearing on this fairness issue? Well, to the extent there was, it was the beginning of my oral argument when I orally moved to strike the papers that we had just received the night before. That was the issue that was presented to the judge. Okay. But the rule says may be filed. But it says within the time. You run into that problem when you have these cross motions for summary judgment. Yeah. What this court has done before is has said to the district courts, you get to manage your docket and the scheduling for these things. And that court rule says within the time prescribed. And the time prescribed was October 12th. Not October 31. We understand your position. Thank you. Let's hear from your opponent. Thank you. Thank you, Your Honors. What happened on that? I'll talk about that first right now. And if I could have a little extra time, please, for my response. Because there was a lot of time spent by my opponent. So I can cover these issues. With respect to the deadline for response, the district court issued an order. And it said that the deadline for response, and that was the word, response. These are cross motions for summary judgment. The parties shall file their responses by October 12th. That's all it said. It didn't say, you know, I don't want to see six briefs. I want to see four briefs, the things counsel was saying. That might have made it a little clearer. As trial counsel, and you can see this in the record we've submitted, said, I read that. I thought response meant response. It's not the same thing as a reply. In fact. All you got to do is call the clerk up and say, is that the end of it? Yeah, probably should have. But didn't. And was unfortunately led by that, plus years of experience in which perhaps he had never had a case in which he couldn't file a reply on summary judgment. And suddenly got into court and found that the court intended that to mean reply. Now the rule, there are a couple of rules that are really important. And your Honor is getting to the rules. I mean, Judge Bea has cited already 56C, which says. Just come to the point. We don't need all the introductions. Well, that says what it says. You can put in affidavits, which is the key thing, the evidence, till the very day before. And that's the federal rule. A district judge is not allowed to contravene the federal rule by her own order. She can do, the district court as a whole can promulgate a local rule that sets forth a deadline that's earlier. But in this case, did not. And even if they do, Marshall V. Gates, the case cited by my opponent, also holds, quote, that a motion for summary judgment cannot be granted simply because the opposing party violated a local rule. And that's really what happened here. A major part of our evidence got struck, and she didn't even look at it. And then she ruled as if we'd never rebutted the evidence of our opponents. So it was a fundamentally unfair process. It is, it is. The matter will stand submitted. All right. Well, may I address the merits, please, for a moment in my rebuttal? Because I really had. You've got nine seconds. But, but he had an extra 10. You're answering questions, though. Of course. But the merits, well, okay. Go ahead. Well, give me a minute. Give me a minute. Thanks. I want to make a key point. The Hong Kong magistrate ruled that the, the fuselage was subject to forfeiture and import illegally at the time. That piece of paper referred to was obtained by my client later, and just in the nick of time, in order to save that thing from being forfeited. Thank you. All right. Thank you. Okay. Court will adjourn until 9 a.m. tomorrow morning.
judges: Pregerson, Bea, Mahan